b

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### ALEXANDRIA DIVISION

DEANDRE JOHNSON,                    CIVIL ACTION 1:13-CV-03136
Petitioner

VERSUS                             JUDGE DRELL

N. BURL CAIN, WARDEN,
Respondent                         MAGISTRATE JUDGE PEREZ-MONTES

## REPORT AND RECOMMENDATION

Petitioner Deandre Johnson ("Johnson") filed a Petition for Writ of Habeas Corpus (Doc. 1) pursuant to 28 U.S.C. § 2254. Because Johnson has not carried his burden of proving that his conviction is not supported by sufficient evidence, he had ineffective assistance of counsel, or he was denied due process at trial, Johnson's Petition should be DENIED and DISMISSED WITH PREJUDICE.

## I.    Background

Johnson contests his conviction on one count of manslaughter. (Docs. 1, 10, 28). Johnson was sentenced to life imprisonment as a habitual offender. (Doc. 1).

In State v. Johnson, 2006-1263 (La. App. 3d Cir. 2/7/07), 948 So.2d 1229, 1230-31, writs den., 2007-0467, 2007-0509 (La. 10/12/07), 965 So.2d 398-99, the Louisiana Third Circuit Court of Appeal made the following findings of facts in this case:

> The victim, Willous Johnson, went to Defendant's apartment, located in Hessmer, Louisiana, around eleven o'clock at night on December 2, 2004. An altercation occurred between the victim and Defendant at the door when the victim tried to force his way into the apartment. Defendant stabbed the victim in the neck with a kitchen knife. The victim left the doorway, but collapsed and died in the parking lot of the apartment complex. Defendant put the victim's body into the trunk of

his live-in girlfriend's car and with her and two children he drove to Baton Rouge where he disposed of the body in a ditch along a country road. The next morning, he sent his girlfriend home. When she arrived back in Hessmer, she contacted the police and led them to the body. Defendant fled to California. He was apprehended ten months later.

A jury convicted Johnson of second-degree murder, and he was sentenced to life imprisonment. See Johnson, 948 So. 3d at 1230. On direct appeal of his conviction, the Louisiana Third Circuit Court of Appeal reversed the conviction, finding the State had failed to prove Johnson had the specific intent to kill the victim, who had been trying to force his way into Johnson's apartment. See Johnson, 948 So. 3d at 1237-38. The Court of Appeal found "the jury abused its vast discretion in finding that Defendant committed second degree murder," and entered a conviction on the lesser included offense of manslaughter. See Johnson, 948 So. 3d at 1238.

On remand for resentencing, the District Attorney filed a habitual offender bill, and Johnson was re-sentenced to life imprisonment as a fourth felony offender. See State v. Johnson, 2008-0494 (La. App. 3d Cir. 11/5/08), 996 So. 32d 1235, 1236, writ den., 2008-2844 (La. 9/25/09), 18 So. 3d 84.

Johnson raises the following grounds for *habeas* relief (Docs. 1, 10, 28):

1.  The evidence was insufficient to support the amended verdict of manslaughter.

2.  Johnson had ineffective assistance of counsel because: (1) counsel failed to object when the prosecution presented a different coroner to testify about the victim's autopsy instead of the coroner who authored the report; (2) counsel failed to present a forensic pathologist to rebut the coroner's testimony; (3) counsel erroneously stipulated to the quantity of drugs and alcohol in the victim's system without further investigation; (4) counsel failed to investigate the crime scene and thereafter subpoena an expert in the field of decomposition and blood splatter; (5) counsel failed to investigate and call Kevin Jacobs as a witness to corroborate the

defense that the victim was armed with a gun when he attempted to force his way inside Johnson's apartment; and (6) counsel told the jury during his opening statement that Johnson was going to testify, but then failed to place him on the stand.

3. The trial court denied Johnson due process when it refused to grant his request for funding to hire expert witnesses to explain the damage decomposition and insect infestation on the victim's body, and the blood spatter.

Respondent answered, admitting that Johnson exhausted his administrative remedies and that the Petition is timely (Doc. 30). Johnson filed a reply (Doc. 32).

<u>Law and Analysis</u>

A. <u>Rule 8(a) Resolution</u>

The Court is able to resolve this habeas corpus petition without the necessity of an evidentiary hearing because there is no genuine issue of material fact relevant to the petitioner's claims, and the state court records provide the required and adequate factual basis. <u>See</u> <u>Moya v. Estelle</u>, 696 F.2d 329, 332-33 (5th Cir. 1983); <u>Easter v. Estelle</u>, 609 F.2d 756, 761 (5th Cir. 1980); Habeas Corpus Rule 8(a).

B. <u>Standard of Review</u>

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall be considered only on the ground that he is in custody in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a). The role of a federal *habeas* court is to guard against extreme malfunctions in the state criminal justice systems, not to apply *de novo* review of factual findings or to substitute its own opinions for the determination made by the

trial judge.  See Davis v. Ayala, 135 S. Ct. 2187, 2202 (U.S. 2015) (citing Harrington v. Richter, 562 U.S. 86, 102–03 (2011).

Under 28 U.S.C. § 2254, *habeas* relief is not available to a state prisoner with respect to a claim that was adjudicated on the merits in the State court proceedings unless the adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  See Martin v. Cain, 246 F.3d 471, 475-76 (5th Cir. 2001), cert. den., 534 U.S. 885 (2001).

Therefore, Section 2254(d) demands an initial inquiry into whether a prisoner's "claim" has been "adjudicated on the merits" in state court; if it has, a highly deferential standards kick in.  See Davis, 135 S. Ct. at 2198 (citing Harrington v. Richter, 562 U.S. 86, 103 (2011)).

Pure questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1), and questions of fact are reviewed under § 2254(d)(2).  See Martin, 246 F.3d at 475-76.

### C.    Johnson's manslaughter conviction is supported by sufficient evidence.

Johnson argues there is insufficient evidence to support his manslaughter conviction.  Johnson contends that he was defending himself and that the victim's death was an accident.

A reviewing court confronted with a claim of insufficient evidence must, after viewing all the evidence in the light most favorable to the conviction (prosecution), determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  See Cupit v. Whitley, 28 F.2d 532, 542 (5th Cir. 1994), cert. den., 513 U.S. 1163 (1995), citing Jackson v. Virginia, 443 U.S. 307 (1979).  *Habeas* relief on a claim of insufficient evidence is appropriate only if it is found that, upon the record evidence adduced at trial, no rational trier of fact could have found proof of guilt beyond a reasonable doubt.  See West v. Johnson, 92 F.3d 1385 (5th Cir. 1996), cert. den., 520 U.S. 1242 (1997) ( citing Jackson v. Virginia, 443 U.S. 307, 322-26 (1979)).  To apply this standard, a court looks to elements of the offense as defined by state law.  See Donahue v. Cain, 231 F.3d 1000, 1004 (5th Cir. 2001).

Johnson was ultimately convicted of manslaughter when the Louisiana Third Circuit Court of Appeal vacated his second degree murder conviction due to insufficient evidence of specific intent.[1]  The Court of Appeal found Johnson guilty, instead, of the lesser included offense of manslaughter pursuant to La. R.S. 14:31(A)(2).

La. R.S. 14:31(2)(a) defines manslaughter as:

 (2) A homicide committed, without any intent to cause death or great bodily harm.

---

[1] The Court of Appeals was authorized by statute to enter a verdict on a lesser included offense. La. C. Cr. P. art. 821(E).  "Even though we find that the killing was not justified, we find merit in Defendant's second assignment, that the evidence is insufficient to prove second degree murder, but would support a conviction of manslaughter because the State failed to prove that Defendant had the specific intent to kill the victim." Johnson, 948 So.2d at 1237.

> (a) When the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Article 30 or 30.1, or of any intentional misdemeanor directly affecting the person;

In this case, the intentional misdemeanor was aggravated assault, or "an assault committed with a dangerous weapon." See La. R.S. 14:37.

"A homicide is justifiable when it is 'committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.' La. R.S. 14:20(A)(1)." State v. Frazier, 2014-1132 (La. App. 3 Cir. 3/4/15), 157 So.3d 1266, 1272, writ den., 2015-0657 (La. 2/26/16), 187 So.3d 467.[2]  When a defendant asserts he should not be found guilty because the killing resulted from self-defense, the State bears the burden of proving beyond a reasonable doubt the defendant did not act in self-defense.  See Frazier, 157 So.3d at 1272 (citing State v. Richards, 06–1553 (La. App. 3 Cir. 5/2/07), 956 So.2d 160, writ den., 07–1129 (La.12/14/07), 970 So.2d 529).

On *habeas* review, a jury's determination of witness credibility, the inferences made on the evidence, and the jury's reasonable construction of the evidence are entitled to a great deal of deference by a reviewing court.  See Marshall v. Lonberger,

---

[2] "In examining a claim of self-defense, it is necessary to consider: (1) whether the defendant had a reasonable belief that he was in immediate danger of death or great bodily harm; (2) whether, under circumstances such as the possibility of escape, killing was necessary to prevent that death or great bodily harm; and (3) whether the defendant was the aggressor in the conflict." Frazier, 157 So.3d at 1272-73 (citing State v. Jenkins, 98–1603 (La. App. 4 Cir. 12/29/99), 750 So.2d 366, writ den., 00–556 (La.11/13/00), 773 So.2d 157). "A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict."  La. R.S. 14:21; Frazier, 157 So.3d at 1272-73.

459 U.S. 422, 433-35 (1983). In addition, where there has been a thoughtful review of the sufficiency of the evidence by a state appellate court, that court's findings are entitled to great weight. See Jackson, 443 U.S. at 322 n.15.

In this case, the jury's findings on the issue of intent were rejected. As discussed at length by the Court of Appeals, the jury plainly found that Johnson's response to the victim's attempted forced entry into his apartment was excessive. See Johnson, 948 So. 2d at 1231-1237. "Defendant's use of force was disproportionate to the circumstances of someone knocking on his door at eleven o'clock at night." Johnson, 948 So.2d at 1237 (finding Defendant could have not opened the door until he ascertained who was there, or could have called 911).

Although Johnson claimed the victim was armed with a gun, no gun was found. The victim's two friends, Lawrence Johnson ("Lawrence") and Robert Jones ("Jones"), waited for the victim in the car while he went to Johnson's apartment. Lawrence and Jones checked on the victim after about 20 minutes and found him lying dead in a puddle of blood. (Doc. 42-17, pp. 57-59). The victim's friends left the scene, thereby affording Johnson the opportunity to move the victim's body. (Doc. 42-17, pp. 59-63). As discussed below, Lawrence and Jones both testified, and told the police, that they did not see a gun in the victim's possession, or at the scene, that night. (Doc. 42-10, pp. 35-36, 38, 39; Doc. 42-11, p. 16). There was no evidence that the victim was armed other than Johnson's self-serving testimony.

The state court concluded that "[Johnson's] use of force was disproportionate to the circumstances of someone knocking on his door at eleven o'clock at night.

[Johnson] had the option of not opening the door until he ascertained who was at the door or to call 911.  In this instance, we find the State met its burden of proving beyond a reasonable doubt that [Johnson] did not act in self-defense and that the 'shoot the burglar' provision is inapplicable. Accordingly, the killing was not justified . . . ." See Johnson, 948 So.2d at 1237.

Since Johnson has not shown the state courts' conclusion that Johnson did not act in self-defense was based on an unreasonable determination of the facts in light of the evidence presented at trial, and according great weight to the state court's finding, the Court finds that Johnson is not entitled to *habeas* relief on this issue.

D.    <u>Johnson did not have ineffective assistance of counsel.</u>

Next, Johnson contends he had ineffective assistance of counsel because: (1) his counsel failed to object when the prosecution presented a different coroner to testify about the victim's autopsy instead of the coroner who authored the report; (2) his counsel failed to present a forensic pathologist to rebut the coroner's testimony; (3) his counsel erroneously stipulated to the quantity of drugs and alcohol in the victim's system without further investigation; (4) his counsel failed to investigate the crime scene and thereafter subpoena an expert in the field of decomposition and blood splatter (discussed in Section E below); (5) his counsel failed to investigate and call Kevin Jacob as a witness to corroborate the defense that the victim had a gun when Johnson attempted to force his way inside the apartment; and (6) his counsel told the jury during his opening statement that Johnson was going to testify, but then failed to place him on the stand.

8

1.    <u>The standard for ineffective assistance of counsel.</u>

To establish that his legal representation at trial fell short of the assistance guaranteed by the Sixth Amendment, a convicted defendant must meet the two-pronged test set forth by the Supreme Court in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).  He must show that his counsel's performance was both deficient (that counsel did not provide reasonably effective assistance under prevailing professional norms) and prejudicial (that errors by counsel "actually had an adverse effect on the defense").  <u>See</u> <u>Anderson v. Collins</u>, 18 F.3d 1208, 1215 (5th Cir. 1994) (citing <u>Strickland</u>, 466 U.S. at 686-89, 693).  The former component of the test authorizes only "highly deferential" judicial scrutiny, requiring the defendant to overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.  <u>See</u> <u>Anderson</u>, 18 F.3d at 1215 (citing <u>Strickland</u>, 466 U.S. at 689).  On the latter component, it is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding; rather, he must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  <u>See</u> <u>Anderson</u>, 18 F.3d 1215 (citing <u>Strickland</u>, 466 U.S. at 693).

A court considering a claim of ineffective assistance must apply a strong presumption that counsel's representation was within the wide range of reasonable professional assistance.  <u>See</u> <u>Harrington v. Richter</u>, 562 U.S. 86, 104 (2011) (citing <u>Strickland</u>, 466 U.S. at 689).  The challenger's burden is to show that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the

defendant by the Sixth Amendment.  See Richter, 562 U.S. at 104 (citing Strickland, 466 U.S. at 687).

With respect to prejudice, a challenger must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. See Richter, 562 U.S. at 104 (citing Strickland, 466 U.S. at 694).  It is not enough to show that the errors had some conceivable effect on the outcome of the proceeding.   See Richter, 562 U.S. at 104 (citing Strickland, 466 U.S. at 693).  Counsel's errors must be so serious as to deprive the defendant of a fair trial, a trial concluding with a reliable result.  See Richter, 562 U.S. at 104 (citing Strickland, 466 U.S. at 687).

> ### 2.  Johnson did not prove prejudice arising from his attorney's failure to call Dr. Suarez to testify or present a forensic pathologist to rebut Dr. Mayeux's testimony.

First, Johnson contends his attorney failed to object when the State presented a different "coroner" to testify about the victim's autopsy instead of the forensic pathologist (Dr. Suarez) who authored the report.

Complaints of uncalled witnesses are not favored because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified to are largely speculative.  See Graves v. Cockrell, 351 F.3d 143, 155 (5th Cir. 2003), amended in other part, 351 F.3d 156 (5th Cir. 2003), cert. den., 541 U.S. 1057 (2004) (citing Buckelew v. United States, 575 F.2d 515, 521 (5th Cir. 1978)); see also Boyd v. Estelle, 661 F.2d 388, 390 (5th Cir. 1981).  Where

the only evidence of a missing witness's testimony is from the defendant, a court should view claims of ineffective assistance with great caution.  See Sayre v. Anderson, 238 F.3d 631, 636 (5th Cir. 2001) (citing Lockhart v. McCotter, 782 F.2d 1275, 1282 (5th Cir. 1986), cert. den., 479 U.S. 1030 (1987)).  Unless a petitioner provides a court with affidavits (or similar matter) from the alleged favorable witnesses suggesting what they would have testified to, claims of ineffective assistance of counsel generally fail for lack of prejudice.  See Sayre, 238 F.3d at 636.

In this case, the report of the forensic pathologist who conducted the autopsy, Dr. Suarez, was introduced into evidence.[3]  That report showed that Dr. Mayeux, the Avoyelles Parish coroner who purported to testify as to the contents of the autopsy report and offered his opinion as to the events that led to the victim's death, actually deviated from the autopsy report when he testified the victim had two slashes in his

---

[3] The autopsy report was completed by pathologist Dr. Alfredo Suarez at the request of the Point Coupee coroner. (Doc. 101, p. 45).  Dr. Suarez stated in the autopsy report that there was a "deep slash to the anterior neck with/including: (a) severed right carotid and right brachiocephalic trunk, as well as internal jugular vein; (b) massive right sided hemothorax; (c) severed trachea; and (d) mild body decomposition." (Doc. 1-1, p. 46).  The official cause of death was "exsanguination due to severed neck blood vessels due to deep slash to the anterior neck." (Doc. 1-1, p. 45).  The victim was found "lying on his back in a ditch in Pointe Coupee Parish, apparently the victim of a stab wound to the throat.  The report from the Coroner's Office approximates that this victim has been dead for 2-3 days and is beginning to decompose." (Doc. 1-1, p. 47.)  The pathologist also noted a few maggots in the neck wound. (Doc. 1-1, p. 47).  The pathologist further wrote: "There is a deep slash on the anterior neck extending from the right margin of the sternal notch diagonally across the midline and onto the left lateral aspect of the neck.  This gaped open wound measures 9 c. in length with the margins open at 3 cm and with a maximum depth of 1.5 inches." (Doc. 1-1, p. 47).  "On further exploration of the neck organs there is a severed trachea below the cricoid cartilage and a completely severed brachiocephalic trunk and right carotid artery, as well as the right internal jugular vein.  The vasculature of the left neck is not injured, however, there is adventitial hemorrhage covering the left jugular vein and there is anterior hemorrhage to the cervical spine.  Bundles of the right sternocleidomastoid muscle are also severed." (Doc. 1-1, p. 48).

neck.[4]  On cross-examination, Dr. Mayeux admitted the autopsy report indicated only one slash.  (Doc. 42-16, p. 19).  However, Dr. Mayeux explained that he could tell, from two of the autopsy photos, that the differences in depth and "angulation" prove there were two different cuts made on the victim's neck.  (Doc. 42-16, pp. 19-20).  Dr. Mayeux further stated the first "superficial" cut was not noted on the autopsy report because Dr. Suarez was focused on the fatal wound and had disregarded the more superficial wound.  (Doc. 42-16, p. 21).

Dr. Mayeux's testimony tended to show that Johnson deliberately stabbed deeply into the victim's neck with intent to kill him.  However, the Court of Appeal implicitly found Dr. Mayeux's testimony was not credible when it found the State had not proven Johnson had the specific intent to kill the victim.

Johnson argues at length concerning a violation of the Confrontation Clause in not having Dr. Suarez testify as to the findings in his autopsy report.  However, Johnson does not dispute Dr. Suarez's findings.  Instead Johnson complains that Dr. Mayeux was permitted to testify as to the contents of the autopsy report.

Since Dr. Mayeux's testimony was ultimately given little or no weight by the state courts, Dr. Suarez's autopsy report must ultimately have been relied upon to

---

[4] Dr. Mayeux testified that he drew his conclusions from the autopsy report and two of the autopsy photographs (State Ex. 1, State Ex. 2, and State Ex. 3).  (Doc. 42-16, p. 9).

Dr. Mayeux is a family practice doctor and the elected coroner of Avoyelles Parish.  It is not clear that he is qualified to offer expert testimony in the area of forensic pathology.  Forensic pathologists must have completed a residency program in forensic pathology, followed by a one-year specialized fellowship in forensic pathology, and must be board-certified by the American Board of Pathology.

prove manner of death.  Therefore, Johnson cannot show prejudice arising from the fact that his attorney did not call Dr. Suarez to testify.

Likewise, because Dr. Mayeux's testimony was ultimately discredited, Johnson cannot prove prejudice arising from his attorney's failure to call a forensic pathologist (or Dr. Suarez) to rebut Dr. Mayeux's testimony.

> ### 3.  <u>Johnson's attorney was not ineffective in stipulating to the drugs and alcohol in the victim's blood.</u>

Next, Johnson contends his attorney erroneously stipulated the victim had .05 blood alcohol concentration and detectible quantities of marijuana and cocaine in his blood.  (Doc. 42-15, p. 25).  Johnson complains his attorney should have subpoenaed the toxicologist who examined the victim's blood to prove the victim was high on drugs and alcohol and "intent on killing or inflicting great bodily harm" on Johnson. Johnson further alleges his attorney made virtually no mention of the victim's intoxicated, drugged stated, alluding to it only briefly in closing argument.

Johnson's attorney did not err in stipulating to the State's toxicology report on the victim.  Had Johnson employed his own toxicologist, nothing indicates the victim's blood test results would not have been the same.

The State disclosed the stipulation to the jury in closing argument.  (Doc. 42-17, p. 149).  The victim's friends also testified that the victim had one or two beers and some marijuana prior to visiting Johnson.  A low blood alcohol concentration and low amounts ("detectable quantities") of cocaine and marijuana do not definitively establish the victim was so "loaded" on drugs and alcohol that Johnson had to defend

himself from him with a deadly weapon.  Johnson has not shown that testimony from a toxicologist would have proven self-defense.

Johnson has not shown he was prejudiced by his attorney's stipulation to the State's toxicology report, or by his failure to employ a toxicologist to testify as to the victim's intoxication level.  Johnson has not adduced any evidence to show the victim's toxicology report supported his self-defense claim.

### 4.  Johnson's counsel did not err in failing to call Kevin Jacobs as a witness.

Next, Johnson contends his counsel erred in failing to investigate and call Kevin Jacobs ("Jacobs") as a witness to corroborate Johnson's claim that the victim was armed with a gun when he attempted to force his way inside Johnson's apartment.   Johnson contends the victim's two friends who rode to Johnson's apartment complex with the victim, Lawrence and Jones, apparently took the victim's gun and left it with Jacobs.

Lawrence told the police that, after he and Jones found the victim on the ground, they got back in the car and drove straight to Marksville to Kevin Jacob's house.  (Doc. 42-10, p. 32).  At Jacob's house, Jones told Jacobs what had happened, and Lawrence used Jacobs's phone to call 911 and report the victim's location and injury.  (Doc. 42-10, pp. 32-33).  After the call to 911, Lawrence called the victim's girlfriend and told her, after which they went to pick her up.  (Doc. 42-10, p. 33).  Lawrence then showed the police where he and Jones had left the victim.  (Doc. 42-10, p. 34).

Lawrence also stated the victim had shown Lawrence his gun earlier that day, but Lawrence did not know if the victim had taken it to Johnson's apartment. (Doc. 42-10, p. 35). Lawrence said he did not see the victim with a gun that night, there was no gun near the victim's body, he and Jones did not pick up a gun from the scene, and they did not leave a gun with Jacobs that night. (Doc. 42-10, pp. 35-36, 38, 39). Detective Carmouche asked Lawrence: "So, if Kevin tells me y'all left a gun there [at Kevin's house] then you lying?" Lawrence responded that Kevin would be lying. (Doc. 42-10, p. 36). Lawrence testified at trial that he had seen the victim carry a gun before and had seen it in his possession earlier the day he was killed, but did not see the gun the night he was killed. (Doc. 42-17, pp. 70-72).

Jones told the police that he did not see the victim with a gun and did not see a gun on the ground near the victim (Doc. 42-11, p. 16). Jones testified he had never seen the victim with a gun. (Doc. 42-17, p. 87).

Detective Carmouche testified at trial that Dametria Clayton, Robert Jones, and Lawrence Johnson were all questioned about whether the victim had a gun, and there was no indication that he possessed a gun at the time of the incident. (Doc. 42-17, p. 45). However, there was evidence that the victim owned a gun and one of the witnesses (Lawrence) had seen it, but not on the night of the incident. (Doc. 42-17, p. 45).

Johnson argues that Jacobs must have told Detective Carmouche that Lawrence and Jones left a gun with him. However, Detective Carmouche phrased

the question to Lawrence as: "So *if* Kevin tells me . . . ." That question does not imply that Jacobs told Detective Carmouche that Lawrence and Jones left a gun with him.

Therefore, Johnson has not shown his attorney was ineffective in not calling Kevin Jacobs as a witness.

### 5.  Johnson waived his right to testify.

Johnson contends his counsel erred because he told the jury during his opening statement that Johnson was going to testify, then failed to place him on the stand.

Johnson's attorney stated during his opening statement: "Mr. Johnson will explain to you why he didn't want to see his cousin.  Nevertheless, his cousin forced his way in.  This man was scared to death.  He had Dametria Clayton and the children in the apartment."  (Doc. 42-16, p. 2).

When it was time for Johnson to testify, Johnson's attorney informed the court (out of the presence of the jury) that Johnson had, earlier, insisted on testifying despite his attorney's advice not to do so.  (Doc. 42-17, p. 143).  However, Johnson changed his mind.  Johnson waived his right to testify on the record.  (Doc. 42-17, pp. 143-47).  Therefore, Johnson's attorney did not "fail" to call him to testify.

Although his attorney had stated that Johnson was going to "explain" why he did not want to see his cousin that night, he did not state that Johnson himself would testify.  In fact, the other witnesses, in particular Dametria Clayton, explained to the jury why Johnson did not want to see his cousin and why he was afraid of him. Johnson cannot show prejudice arising from his attorney's single statement that Johnson would "explain" to the jury why he did not want to see his cousin.

16

### E.    Johnson was not denied due process and did not have ineffective assistance of counsel for not having experts in decomposition and blood spatter analysis.

Johnson contends he was denied due process when the trial court refused to grant his request for funding to hire expert witnesses to explain the damage decomposition and insect infestation on the victim's body, and the blood splatter. Johnson also contends his attorney was ineffective in failing to investigate the crime scene and thereafter "subpoena" an expert in the field of decomposition and blood splatter.[5]

Johnson alleges a blood spatter expert could have testified as to whether Johnson was inside his apartment (trying to close the door) or was standing in the doorway when the victim was injured. Johnson further alleges a decomposition expert could have testified whether decomposition of the body and maggot infestation were responsible for the condition described by Dr. Mayeux (the appearance that the victim had been stabbed twice). Johnson alleges testimony from these experts would have supported his claim of self-defense.

Fundamental fairness entitles indigent defendants to an adequate opportunity to present their claims fairly within the adversary system. See Ake v. Oklahoma, 470 U.S. 68, 77 (1985) (citing Ross v. Moffitt, 417 U.S. 600, 612 (1974)). To implement this principle, the United States Supreme Court has focused on identifying the basic tools of an adequate defense or appeal and has required that such tools be provided to defendants who cannot afford to pay for them. See Ake, 470 U.S. at 77 (citing Britt

---

[5] Of course, Johnson's attorney could not have simply "subpoenaed" experts. He would have had to hire them with funding granted by the court.

v. North Carolina, 404 U.S. 226, 227 (1971)).  Three factors are relevant to this determination: (1) the private interest that will be affected by the action of the State; (2) the governmental interest that will be affected if the safeguard is to be provided; and (3) the probable value of the additional or substitute procedural safeguards that are sought, and the risk of an erroneous deprivation of the affected interest if those safeguards are not provided.  See Ake, 470 U.S. at 77 (citing Matthews v. Eldridge, 424 U.S. 319, 335 (1976)).

"The private interest in the accuracy of a criminal proceeding that places an individual's life or liberty at risk is almost uniquely compelling . . . . The interest of the individual in the outcome of the State's effort to overcome the presumption of innocence is obvious . . . ." See Ford v. Cockrell, 315 F. Supp. 2d 831, 855 (W.D. Tex. 2004), aff'd sub nom., Ford v. Dretke, 135 Fed. Appx. 769 (5th Cir. 2005) (citing Ake, 470 U.S. at 78 )).  "The State's interest in prevailing at trial is . . . necessarily tempered by its interest in a fair and accurate adjudication of criminal cases."  See Ford, 315 F. Supp. 2d at 855 (citing Ake, 470 U.S. at 79).  The Court's conclusion, therefore, hinges on the last factor.  See Ford, 315 F. Supp. 2d at 855 (citing Ake, 470 U.S. at 77).

To be entitled to the appointment of a non-psychiatric expert witness, an indigent defendant must demonstrate something more than a mere possibility of assistance from the requested expert.  See Ford, 315 F. Supp. 2d at 855.  Under the standard adopted in the Fifth Circuit for determining whether an indigent defendant has a right of state-funded access to non-psychiatric experts, a criminal defendant

has no due process right to the assistance of such an expert unless the expert testimony to be obtained is "both critical to the conviction and subject to varying expert opinion." See Yohey v. Collins, 985 F. 2d 222, 227 (5th Cir. 1993) (quoting Scott v. Louisiana, 934 F. 2d 631, 633 (5th Cir. 1991); see also Goodwin v. Johnson, 132 F. 3d 162, 188 (5th Cir. 1997). In determining whether the trial court erred in denying the motion for appointment of an expert, this Court's task is to quantify the probable value of the expert testimony and the risk that the jury reached an erroneous conclusion because it did not have the benefit of such expertise. See Ford, 315 F. Supp. 2d at 855.

Johnson argues that blood spatter and decomposition experts would have supported his version of the event and his claim of self-defense. Johnson contends the experts would have rebutted Dr. Mayeux's "forensic expert" testimony. However, as already explained, Dr. Mayeux's testimony was implicitly rejected by the Court of Appeals when it vacated Johnson's conviction for second degree murder, finding there was no evidence of specific intent. Without Dr. Mayeux's testimony to rebut, blood spatter and decomposition were not critical to the court's conclusions that Johnson committed manslaughter and did not act in self-defense.

Johnson also argues the blood spatter expert would show the victim was in or entering Johnson's apartment, and not moving away from the door, when he was fatally stabbed. The photographs and testimony by Detective Carmouche showed there was blood spatter was on the door and door jam, and a couple of drops inside Johnson's apartment (Doc. 42-17, pp. 19-21).

The Court of Appeals found Johnson's action in stabbing the victim was too forceful a response to the victim's aggression to qualify as self-defense. It did not find (or even mention) that Johnson stabbed the victim as he was retreating from the confrontation (as argued by the State in closing argument, Doc. 42-17, p. 152).

Because Johnson's self-defense theory was rejected on other grounds and Dr. Mayeux's testimony was implicitly rejected, the probable value of testimony from a blood spatter expert and a decomposition expert would have been low. Therefore, Johnson has not shown he was denied due process when his request to employ experts was denied.

## II.   Conclusion

Because Johnson did not carry his burden of proving that there was insufficient evidence to support his conviction, he had ineffective assistance of counsel, or that he was denied due process, his § 2254 Petition for Writ of Habeas Corpus (Doc. 1) should be DENIED AND DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule 2(b), parties aggrieved by this recommendation have fourteen (14) days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy of any objections or response to the District Judge at the time of filing. No other briefs (such as supplemental objections, reply briefs etc.) may be filed. Providing a courtesy copy of the objection to the magistrate judge is neither required

nor encouraged.  Timely objections will be considered by the district judge before he makes a final ruling.

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within fourteen (14) days following the date of its service, or within the time frame authorized by Fed. R. Civ. P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error.** See Douglass v. United Services Automobile Association, 79 F.3d 1415 (5th Cir. 1996).

Pursuant to Rule 11(a) of the Rules Governing Section 2254 cases in the United States District Courts, this Court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. Unless a Circuit Justice or District Judge issues a certificate of appealability, an appeal may not be taken to the court of appeals. **Within fourteen (14) days from service of this Report and Recommendation, the parties may file a memorandum setting forth arguments on whether a certificate of appealability should issue.** See 28 U.S.C. § 2253(c)(2). A courtesy copy of the memorandum shall be provided to the District Judge at the time of filing.

THUS DONE AND SIGNED in Alexandria, Louisiana on this 24th day of October, 2019.

HON. JOSEPH H. L. PEREZ-MONTES
UNITED STATES MAGISTRATE JUDGE